JONATHAN E. NUECHTERLEIN
General Counsel

R. MICHAEL WALLER, GA State Bar 102886
AMANDA B. KOSTNER
Federal Trade Commission
600 Pennsylvania Avenue
Mail Stop CC-9528
Washington, DC 20580
rwaller@ftc.gov, 202-326-2902
akostner@ftc.gov, 202-326-2880
ATTORNEYS FOR PLAINTIFF
FEDERAL TRADE COMMISSION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA
## PHOENIX DIVISION

| | |
|---|---|
| Federal Trade Commission, | No. |
| Plaintiff, | |
| v. | |
| Sitesearch Corporation, dba LeapLab, a Nevada corporation; | **COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF** |
| LeapLab, LLC, an Arizona limited liability company; | |
| Leads Company, LLC a Nevada limited liability company; and | |
| John Ayers, an individual; | |
| Defendants. | |

1

# COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1. The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), to obtain permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a) and 53(b).

3. Venue is proper in this district under 28 U.S.C. § 1391(b) and (c) and 15 U.S.C. § 53(b).

## CASE SYNOPSIS

4. Defendants sold consumer payday loan applications containing consumer financial account numbers, Social Security numbers, and other sensitive personal information to non-lenders, without the consumers' knowledge or consent. The sale of such sensitive information to non-lenders was likely to – and did – lead to substantial consumer injury. At least one of Defendants' customers, Ideal Financial Solutions, Inc. ("Ideal Financial"), used the

sensitive consumer information to make unauthorized debits to consumer financial accounts. Defendants provided sensitive consumer information to Ideal Financial, knowing or having reason to know that Ideal Financial was using this information to make unauthorized charges to consumer bank accounts. As a result, Defendants caused millions of dollars in consumer harm.

## PLAINTIFF

5. The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

6. The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and to secure such equitable relief as may be appropriate, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b), 56(a)(2)(A), 56(a)(2)(B), and 57(b).

## DEFENDANTS

7. Defendant Sitesearch Corporation, *formerly* LeapLab Corporation, ("LeapLab") is a Nevada corporation with its principal place of business in Chandler, Arizona. LeapLab transacts or has transacted business in this district and throughout the United States.

8. Defendant Leads Company, LLC ("LeadsCo") is a Nevada corporation with its principal place of business in Chandler, Arizona. LeadsCo transacts or has transacted business in this district and throughout the United States.

9. Defendant LeapLab, LLC, *formerly* DirectROI, LLC, ("DirectROI") is an Arizona limited liability company with its principal place of business in Chandler, Arizona. DirectROI transacts or has transacted business in this district and throughout the United States.

10. Defendant John Ayers ("Ayers") resides in the District of Arizona and, among other positions, is the founder, Chairman, and former CEO of LeapLab. He also founded and controlled DirectROI and LeadsCo. At all times material to this Complaint, acting alone or in concert with others, he formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint, including the Defendants' sale of consumer payday loan applications containing consumers' Social Security and financial account numbers, as well as other sensitive information, without the consumers' knowledge or consent, to third parties which used the information to commit fraud. In addition, Ayers knew about the business practices set forth in this Complaint, was recklessly indifferent to them, or was aware of a high probability of the fraud and intentionally avoided the truth. In connection with the matters alleged

herein, Ayers transacts or has transacted business in this district and throughout the United States.

## COMMERCE

11. At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

12. From at least 2006 to late 2013, Defendants operated as data brokers, collecting and selling sensitive consumer information from consumer payday loan applications to non-lenders, including fraudsters, spammers, and telemarketers. Defendants sold this information to Ideal Financial Solutions, Inc. and its subsidiaries (collectively, "Ideal Financial"), knowing or having reason to know that Ideal Financial used the information to make unauthorized debits from the consumers' bank accounts.

### Defendants Collected and Sold Consumer Payday Loan Applications to Non-Lenders

13. Defendants collected hundreds of thousands of consumer payday loan applications from thousands of payday loan websites (called, "publishers"). A payday loan is the common name used for a short-term, high-fee, unsecured loan, often made to consumers to provide needed funds in anticipation of an upcoming paycheck.

14. Publishers typically offer to help consumers obtain payday loans. To do so, they require consumers to fill out applications containing sensitive financial information. Payday lenders use this information to evaluate consumers' loan applications and to transfer funds to consumers' bank accounts if they approve the loan.

15. Most applications collected by Defendants contained the consumer's name, address, phone number, employer, Social Security number, and bank account number, including the bank routing number.

16. Publishers transfer the applications to data brokers, which find buyers for the applications. Data brokers may transfer the applications to other data brokers in search of buyers.

17. Defendants received payday loan applications from other data brokers.

18. Defendants sold approximately five (5) percent of these applications to online lenders, which paid Defendants between approximately $10 and $150 per lead.

19. Defendants monetized the remaining 95 percent by selling these applications for approximately $0.50 each to non-lender third parties that did not use the information to assist consumers in obtaining a payday loan or other extension of credit.

20. These non-lender third parties included (1) marketers that made unsolicited sales offers to the consumers via email, text message, or telephone call; (2)

data brokers that aggregated and then resold consumer information; and (3) phony internet merchants, including Ideal Financial, that used the consumers' sensitive information to commit fraud by debiting consumers' bank accounts for purported financial products that the consumers never purchased.

21. These non-lenders have no legitimate need for the Social Security and financial account numbers contained in the payday loan applications.

22. In many instances, Defendants sold the same consumer payday loan applications to multiple non-lender third parties.

23. Selling a single consumer payday loan application to multiple buyers put the consumer at greater risk of fraud and violated Defendants' agreements with the publishers.

### Defendants Sold Consumer Payday Loan Applications to Ideal Financial

24. Defendants sold consumer payday loan applications or information assembled from them to Ideal Financial.

25. Between 2009 and 2013, Ideal Financial purchased at least 2.2 million consumers' financial information from data brokers and used it to make millions of dollars in unauthorized debits and charges.

26. Ideal Financial falsely told complaining consumers that they purchased its bogus financial management or counseling products at a payday loan website.

27. Ideal Financial used the information it purchased from Defendants to debit consumers' bank accounts for purported financial products that consumers never agreed to purchase.

28. LeapLab provided Ideal Financial with financial account information for at least 16 percent of Ideal Financial's victims.

29. Consumers did not consent to these debits and only learned of them after Ideal Financial had debited their bank accounts.

30. Defendants began selling consumer information to Ideal Financial in or about February 2012.

31. On or about April 25, 2012, Jeff Petersen ("Peterson"), then-CEO of LeapLab, confronted Ayers about Ideal Financial's illegal use of consumer information to make unauthorized charges to consumer bank accounts.

32. Peterson resigned his position at LeapLab on or about May 4, 2012.

33. In or about May 2012, Ayers hired Brian Jensen ("Jensen") as Chief Marketing Officer of LeapLab.

34. Immediately prior to joining LeapLab, Jensen was Vice President of Marketing at Ideal Financial, where, since May 2009, he managed the

information assembled from consumer payday loan applications that Ideal Financial purchased from Defendants and other data brokers.

35. Jensen's responsibilities demonstrate that he knew that Ideal Financial was illegally debiting consumer accounts. His responsibilities at Ideal Financial included developing Ideal Financial's shell companies by recruiting straw officers and fabricating shell websites. Ideal Financial presented these websites to payment processors to meet their underwriting requirements, claiming that its customers purchased its products via the sites. Only eight (8) consumers purchased Ideal Financial's products from the 85 sites that Jensen created between May 2009 and his departure in May 2012.

36. During Jensen's time at Ideal Financial, Ideal Financial processed at least 1.5 million unauthorized charges, totaling over $47 million, to consumer bank accounts using information from consumer payday loan applications purchased from Defendants and other data brokers.

37. While at Ideal Financial, Jensen learned that Ideal Financial used information from consumer payday loan applications to make unauthorized debits from consumers' bank accounts.

38. After Jensen began working for LeapLab in May 2012, he shared his knowledge of these practices with LeapLab's Chief Operating Officer.

39. Nonetheless, until October 2012, Defendants continued selling to Ideal Financial consumer payday loan applications, including consumers' names,

addresses, dates of birth, Social Security and bank account numbers, and other sensitive information.

40. Using only the consumer information provided by Defendants, Ideal Financial debited at least $4.12 million from consumer bank accounts without authorization.

41. In some instances, consumers also were forced to close their bank accounts or suffered insufficient funds fees because of Ideal Financial's unauthorized charges.

## VIOLATIONS OF THE FTC ACT

42. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

43. Acts or practices are unfair under Section 5 of the FTC Act if they cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

## COUNT I

44. As set forth in paragraphs 12 to 41 above, Defendants sold consumer payday loan applications that included consumers' social security and financial account numbers to non-lenders that had no legitimate need for this sensitive personal information. These non-lenders included telemarketers,

text and email marketers, and phony online merchants, like Ideal Financial, that used the information to debit consumer accounts without authorization.

45.  By engaging in the activities referenced in paragraph 44 above, Defendants have caused or are likely to cause substantial injury to consumers, that they cannot reasonably avoid, and that is not outweighed by countervailing benefits to consumers and competition.

46.  Therefore, Defendants have engaged in unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a) and 45(n).

## CONSUMER INJURY

47.  Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

48.  Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund

of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and the Court's own equitable powers, requests that the Court:

A. Enter a permanent injunction to prevent future violations of the FTC Act by Defendants;

B. Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

C. Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

DATED this day of December 22, 2014.

   /s/ R. Michael Waller

R. Michael Waller
Amanda B. Kostner

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION